The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, we'll begin with Zetia Antitrust Litigation v. Merck, and Mr. Boutrous, when you're ready, we'll hear from you. Thank you very much, Your Honor, and good morning. May it please the Court, Theodore Boutrous on behalf of Merck and Glen Merck, I'd like to reserve five minutes for rebuttal. Thank you. At bottom, this appeal presents a fundamental question about class actions. Is this the type of case for which Rule 23 class actions were designed? The answer is clearly no. Class actions were not designed for a group of Fortune 500 companies asserting billion-dollar damage claims. Rather, class actions are meant to help the little guy to allow large groups of people with small claims to band together and sue as a class when it would not be economical for them to do so on their own. Here we have the exact opposite situation. The certified class has only 35 members, and the claims and damages are concentrated in three companies that have billions of dollars of claims and something like 97% of the purchases in this antitrust claim. The members are large, wealthy, sophisticated businesses with both the incentive and motivation to vigorously, directly litigate their substantial claims for billions of dollars. As the Supreme Court has declared, class actions are the exception, not the rule, and they are subject to stringent requirements, which in practice exclude most claims. The claims here do not remotely qualify for class treatment. Right out of the box, the 35-member class fails Rule 23A's numerosity requirement, which requires a finding that the class is, quote, so numerous that jointer of all members is impracticable. And in making— judge exercise some discretion in this. And number two, these 35 companies would come to court if proceeding as a group with probably an average of at least five people per defendant, which would be over 150, 200 people. And to try a case—I don't know, you guys have been in big criminal cases, but I know most districts take big conspiracy cases and chop them down. It just gets impractical to have 200 lawyers and people in a courtroom and people making objections and hearing motions. And so as a practical matter, it's hard to say the district court abuses discretion in this number, which is in this gray area. A lot of cases have suggested as you get toward 20, maybe that works on an individual basis, and when you get above 40, maybe it's more presumptively too many. And this is in that type of range. But I think the bigger question is a practicality, just a physicality, practicality question. And I know both of you are experienced lawyers and probably recognize that. But the big question is, why did Judge Smith go off the deep end and say the numerosity was okay? I just raised those—I haven't—sorry, but it seems to me that's sort of a very pragmatic issue. It is, Your Honor, and you're going right to the practicability point. But the district court did not look at it that way. The district court said that sunk costs and future discovery costs made it—the judicial economy point towards class certification, which the Third Circuit in Medafinil squarely rejected. The district court had done the same thing there. The district court here made the legal error that the district court in Medafinil made by saying, well, there would be a lot of other individual suits, which is not the correct analysis under Rule 23a. You look to the—is it practicable? And it's very, very common. In fact, in Medafinil, once the case went back to the district court, the district court vacated class certification, and the case proceeded with joint plaintiffs. I think it was at least 12, and it's very common. I've been involved in cases where there are joint defense groups with 40, 50 defendants, and everyone coordinates. This is an MDL. This very case is part of an MDL. And from a practical standpoint, the parties are very—sophisticated companies like this are very experienced in joining together, sharing costs. That's what's been happening here, choosing one lawyer to be the lead on the main issues. So from a practical standpoint, this happens all the time. But the district court here didn't look at any of those issues. Instead said, well, there could be—yes, Your Honor. Mr. Boutros, are you urging us to adopt the Third Circuit Medafinil test or not? People are on this line right now from all over the country. The named plaintiffs in this case are not even from Virginia. So it's very easy for large groups individually to join together and litigate. And the class action device can be very, very—it can cut off individuals' rights, companies' rights, and defendants' rights, and there's just no reason for it here. This could be efficiently litigated, just as it was in Medafinil after the Third Circuit vacated the class certification. So yes, Judge Floyd, we think it's a good test. I don't know. You may be aware, but in years past, I was on the Rules Committee, and we had a bunch of hearings on Rule 23, trying to explore revisions to it to solve existing problems. And one of the—it has taken on a life of its own, as we know, since 1966. But one of my questions really was, in this case—this is a very aggressive theory, antitrust theory in this case, and I gather that's before the District Court on summary judgment issue. I have noticed, whether this is correct or not, and I'm not advocating this, but I've noticed a lot of large companies prefer the class action in order to obtain res judicata nationwide and put issues to rest. And this is the type of case that I really, as I read the thing, I wondered, why is Merck fighting the class action rights? I would make it a worldwide class action and try to get peace. I mean, that's one of the claims that people thought it would serve from the other side of the coin. Now, that's a legal strategy, obviously, and it's not before us, but the idea of trying to solve multiple litigations through MDL and class actions is always a very highly discretionary problem. And I know the Supreme Court has not been a fan of class actions in any—if you look at its cases over the period of time, but—well, enough said. I hear you. But you make a good point here. There would be res judicata if we had joined her, and we think there's no reason why these companies can't be joined together and resolve all these claims in one case. And it is very—from a practical standpoint— Well, what's your advantage to have a courtroom full of 200 people as opposed to 25 people you now have, or whatever it is? Well, I think, Your Honor, it wouldn't have to be 200 people. I think we would have summary judgment. We would have litigation where we'd coordinate among—the plaintiffs would coordinate among themselves to respond. They've been doing a very good job of coordinating so far. There are other components of the MDL, so there would be res judicata. The class action mechanism can, as this court's aware, have hydraulic pressure to settle when there are billions of dollars at stake in the class. That's the game here, and that sort of brings me to the bizarre situation. That's the old Greenmail argument, isn't it? Yes. The risk is too high. Exactly. And that's one of the reasons 23F was added to the rules, to allow parties to come to appeal before that pressure occurs. And here, if something's rotten in Denmark, something's wrong here where you have these three major companies with billions of dollars of claims, just like in Modafinil, sitting on the sidelines, and then our three plaintiffs are, I'll put it charitably, a motley crew. They're not adequate. They're not appropriate representatives. One is a litigation vehicle formed by Plaintiffs' Council. It's a shell corporation that is run by a good friend of one of the plaintiffs' lawyers. One is a bankrupt felon that entered a deferred prosecution agreement and then defaulted on its fine to the U.S. government and went bankrupt, and it owes the defendants, Merck and Glenmark, millions of dollars. So it has fiduciary duties to both the class it would have and to the defendants. And then the third, Castillo, didn't even buy the generic for two years after the generics came on the market and didn't buy it until after this lawsuit. So it was seeking pretty clearly to attempt to manufacture standing. So that group is not appropriate to litigate this on behalf of a class of absent class members. So it really turns the class action mechanism on its head. It's not what class action device was meant to foster, where you'd have small individuals, the little guy, banding together where their claims wouldn't be worth it to go alone. That's just not what we have here. And so I think the district court, even, Judge Niemeyer, with the approach you're taking, practicality, could we do this? I think we could. With so much done remotely in these large cases, about 90 percent, right now about 100 percent is done remotely. It's very efficient. There would be a res judicata effect if we prevail. We do think, Judge Niemeyer, you put your finger on something. These reverse payment claims have gone off the rails. It's really interfering with the statutory scheme. I do want to get into that a little bit because there's some issue here about typicality and predominance related to injury. And you've made various arguments in that regard, which raises the antitrust theory. What is the antitrust theory? And these cases involving the misuse of patents or extending patent monopolies are dicey. And in this one, if I understand correctly, and I'll check this out with Mr. Sobel when I talk with him, but if I understand correctly, the injury has to suppose that the patent is invalid. Because otherwise, anything that occurred before expiration of the patent, a patent holder is entitled to charge super competitive prices and has exclusive use of the patent. And it's very strange. And they can license it. There's a broad range of conduct that is appropriate. And I'm not sure that the agreement as written in this case was a violation of the patent. Now, there is a lot of side comments as to the way people try to construe it or attempt to construe it. But it seems to me to presume the need for competitiveness going back to 2010 or 2014 or 2012, whatever date you're picking, means that there's no patent exclusivity at that point. And that's a hard theory to carry because it basically presumes a patent's invalid. Your Honor, exactly. And we also have a problem that they want to prove by averages, even though we know who the 35 plaintiffs are. Well, that's not hard to do. I mean, if there should have been competition in 2012, there's no patent validity, then all you have to do is have a market price established. And the differential between what was actually charged and the market price is the antitrust damage calculation. I mean, there would be damage injury if you had super competitive prices. Your Honor, it's different because the theory is that if a generic had gone on the market earlier, and they have some speculative theory that it would have gone on much earlier, that the plaintiffs would have bought the generic and that the prices would have been lower. But here, our experts put on – When you say earlier, you mean before the end of the patent? Before – once the agreement – under the normal rules, they claim that this agreement caused the generic to be delayed. And so – That, to me, is the rub of the issue, because the theory there is there's an extension of the monopoly beyond the patent term. In other words, the delay in competition, some effect on competition after the expiration of the patent. But I don't understand the theory fully, and Mr. Sobel will explain it to me, I'm sure, of why we're going back before the expiration of the patent and saying that there should have been a competitive situation at that point when the patent gives a Merck exclusivity. It's a very sketchy theory, Your Honor. Well, it's a sketchy theory. It's invalid. That's what they're saying basically. And then the threat to its validity entered into the license agreement or the agreement. And the argument was that there was some compensation paid, but… Another judge had rejected that theory already. And so here the problem – and maybe I'll reserve my time – but here we know some of the plaintiffs did not go into the market, would not have gone, based on their own conduct. So we don't need hypotheticals. And this court in Broussard said averages, including an antitrust, can't mask the lack of injury in addition to the reasons you're pointing to, Your Honor. Yeah, but see, the injury – I'm not sure the timing of a purchase makes a bunch of difference. The question is whether Merck had the monopoly power, had the market power to charge super competitive prices. Anybody buying a super competitive price where competition had been hurt, that's antitrust injury. And it doesn't matter whether they waited to buy or delayed to buy. If they bought above what would have been a competitive price, it seems to me there's damage, isn't there? Well, I think here, Your Honor, that in a generic versus brand market, there are different reasons why a plaintiff would continue to buy the brand as opposed to switching to the generic, just for competitive reasons. Here, we have to look at, as part of the inquiry, what did the party actually do? And so if you just look at Castillo and there are other plaintiffs, and Merck had a strategy for marketing where negotiating, much like the Third Circuit's Lactamol case. So you just – even – you cannot just make this broad assumption that people – that plaintiffs would have gone into the generic market. Castillo didn't. So there are all kinds of problems as to whether at least seven of the plaintiffs had any injury on top of the issues that Your Honor is raising. With that, I'll reserve the rest of my time. Yeah. All right. I'm sorry. I preempted. Did any – Judge Floyd or Judge Rushing, did you have anything further to say at this time? No, sir. Why don't we hear from Mr. Sobel and then we can come back. There's a rebuttal time. Mr. Sobel? Good morning, and may it please the Court. Thomas Sobel, Huggins-Berman, Sobel Shapiro for the direct purchaser class and the plaintiffs. Perhaps, Your Honor, it probably made sense for me first to address this substantive law issue, even though it's not directly before the Court. You asked some questions about it, so if – I was asking it basically to see about the injury. There was some suggestion, argument that because of the nature of injury and damages – and I guess that you guys are making a distinction between antitrust injury and the damages to the individual plaintiffs, because antitrust injury would seem to be common to the whole group. Yes, it would. Whereas the damages might not. So I was trying to figure out where the antitrust injury was and what's needed to prove, and I had a little trouble with your theory on all the conduct you're alleging before the expiration of the patent. Sure. Okay. So let me address that then, Your Honor. It rests on the Supreme Court's decision in Actavis, 2013. We're familiar with that, yes. All right. So essentially what the court in Actavis ruled is following. In a Hatch-Waxman patent dispute, the position of the brand company is that I've got a valid and infringed patent. You should have to stay out of the market until my patent expires. That's the brand's position. The generics position in that litigation is, no, no, no, no. We don't infringe the patent, or your patent's invalid, or both. We should be allowed to enter the market now. And there's no money at stake between the two. And so when they settle that litigation, and they can do so lawfully, on the basis of the merits of the patent dispute, the probabilistic nature of the patent dispute, the parties reach an agreement somewhere between the time of their agreement and patent expiry, somebody in between there, the agreed entry date. What the Supreme Court in Actavis said was, well, wait a second. If in a dispute like that we see a reverse payment, in other words, we see the brand company, in addition to agreeing to an agreed entry date, we see the brand company making a payment to the generic, then that's probably going to be an exchange for moving that agreed entry date later. And the Supreme Court in Actavis has held explicitly that patents may or may not be valid. They may or may not be infringed. It's probabilistic in that the consumers are entitled to the benefit of those probabilities. If you influence settlements with payoffs, agreed entry dates will be later, and consumers will injure. And so that's the basic theory right from the Supreme Court. The circuit courts have, of course, then embraced this notion that if a payment from the brand— For purposes of showing—the answer is twofold, Your Honor. For purposes of showing that the companies violated the antitrust laws by entering into an unlawful agreement, we do not need to prove anything about the patent merits whatsoever. In fact, that's also directly from that Actavis case. Now, however, when I'm trying to prove when that date otherwise would have been for causation, so if I take the reverse payment out of that agreement, and now I'm trying to figure out where would parties have negotiated on the merits of the patent litigation for causation, under most of my theories, I put evidence before the court regarding our view about what those patent merits were. So it does influence its way there. But again, it's probabilistic. There's no yes or no being decided about whether it is valid or isn't valid, fringed or infringed. Instead, it's a probabilistic evidentiary proffer to be able to determine when rational, law-abiding companies not paying each other off would have agreed to an entry date. All right. I didn't want to take you off too far off your main course because on this appeal, I guess Judge Smith has all that before her, but on this appeal, we're really just on a 23F certification. Yeah. So of course, the beginning of the analysis, of course, is that if one looks at this record, we see that the defendants are challenging discretionary decisions by two experienced, thoughtful jurists, Magistrate Judge Miller and Senior District Judge Smith. And in a 96-page report and recommendation in an equally thoughtful order by Judge Smith, they painstakingly go through all of these issues. Now, let me just take as an example the numerosity issue and the practicality. This case is complex. It's unbelievably complex, as you can just tell by the nature of what I was just indicating. We'll have patent evidence. We'll have economic evidence. There'll be evidence about cardiology, about when FDA makes certain approvals. And the district court, when looking at this case, said, essentially, wait a second. This is complicated enough. If we have 32 more plaintiffs in this case, that's not practical. We don't think, because the joinder analysis under the numerosity, at least when you're looking at judicial economy, assumes, let's just assume for a moment, that they all will be joined, or virtually all of them will be joined. Imagine the complexity that that would add. And it's not just lawyers, although it is lawyers. These judges know this already, because there are a small group of retailers who have filed ancillary, parallel cases with us. They are separate cases, but they're in the same proceeding with us. They've got their own separate lawyers. They've argued different 12v6 issues. They've got their own economist that's opining on three issues overlapping with my class. Imagine if you do that 32 more times. No, it's completely impractical. Mr. Sobel, can I ask you about that point? The magistrate judge and the district court both, I think, noted that there wasn't much evidence about pooling resources for joinder, that these expert fees and all of, you know, you're right, it's a complex case. But there's reason to think that not each plaintiff would have, you know, their own expert or their own evidence on this point, but they would work together in the way that they have so far. But the courts in analyzing that question said, you know, the direct purchasers haven't analyzed whether there would be sort of economies of joinder here. So I find that this factor weighs only slightly in favor of class certification. Can you, why is that the right way to think about the factor? If the question is, is joinder impracticable and you bear the burden on that? Certainly, Your Honor. So I think that the record before the district court shows that there are, the district court saw some aspects of numerosity strongly favoring the class and others only slightly favoring the class. The factors that the court saw strongly influencing class was this practicality issue. Indeed, I think the report and recommendation explicitly talked about how you can anticipate that there will be more lawyers, that there will be more discovery disputes that will burn the court unnecessarily. So I think on that factor, I think the district court was fairly clear that the evidence more than was adequate. On the other prong that I think that you're referring to, Your Honor, where the court found it only slightly favoring class is whether or not we're going to see other class members, whether they were or are or are not going to be able to file. And in terms of whether or not they had the ability. Now, there is evidence that was before the district court and it did weigh in our favor and the district court found in our favor that as a practical matter, more than half of our class has negative value claims, meaning that even if you assume that, you know, a high percentage of their likelihood of them winning everything that they've asked for. It does not even make up for the amount of costs that it would take to fund the economists, excuse me, all of the experts. And yes, I think, Your Honor, that they're then trying to say, well, how much more evidence would one need in that particular situation? I think that we made the showing the district court said that we made the showing it didn't wasn't completely bowled over by it, to be sure. I acknowledge, but it did rule in our favor on that on that aspect. But there wasn't a relevant evidence, which was what would. Would there be sharing of these costs and things in joining the court said, you know, presumably there would be, but I don't have evidence about that. So I'm only going to count this slightly in your favor, rather than saying you bear the burden. You didn't put evidence on this. So, you know, that that weighs in the analysis differently. Yes, no, I think that's exactly right, Your Honor. And there is not that kind of evidence in the record. Of course, I will, in fairness to myself, with all all respect, Your Honor, suggest that how would one put that kind of evidence in? I would need to speak to the 32 unnamed class members, have a hypothetical discussion with them about whether they'd be willing to join if some of them, because we know from history that only some of them do, most of them don't have the hypothetical question. Well, would you be willing to share experts? Would you be willing to do this? In other words, case specific evidence about what you see happens in the future and under a hypothetical situation is quite difficult to do in this situation. We did produce to the court, however, evidence from what's happened as a matter of historic fact in other cases. So we know as a matter of historic fact that when the modafinil case was decertified, that most of the at least half, excuse me, at least half of the I'm getting two cases confused. I don't want to misstate something. A third of the class in the provisional case did not file any case at all and was left out of the proceedings, even though it was a case that had already recovered significant dollars for the class. And in Androgel, we know that half of the class did not join once the case was decertified. So we do know as a practical matter what's happened there. And we also know in terms of the sharing experts, that kind of thing, that in this case that there are retailers, but they are not sharing all the experts. That is it. And it does require more work just for one group of retailers to come forward with their own economists, which they have their own dog motions on and they have their own theories as to how to prove market power. And is that the group just to make sure I'm tracking with you? The retailers have already expressed that they would not join. They would opt out of a class. So they're not counted in this 35 class numbers. Is that right? That's right, Your Honor. That's the group that I'm talking about. And so even in a situation where you have the highest probability of trying to have people work together, which is this subgroup of seven wants to litigate by way of joinder, even they are not sharing all the experts. Even they are presenting different 12B6 issues for the court to have to rule upon. And that's just one example of one group. And that's why I think that the district court was acting well within its discretion to be able to be saying, no, it's going to be completely impractical if we're trying to have 32 more plaintiffs joined in this action. I also want to just address briefly this averages argument that has been raised. In this case, there is no reliance on averages for the kind of problem that averages can give rise to. So if you're trying to use averages to be able to prove that there's some average change and that that average change, therefore, has an effect on everybody, the question is, well, OK, what does that average change in relationship to in terms of the harm you're trying to show? Here in this case, we know by looking at the defendant's own records, looking at each class member, what happens. And what Magistrate Judge Miller and Judge Smith observed in their detailed findings is that of the 35 class members, 30 of them, 30 of them, when the generic became available, bought the generic and bought the brand after that period of time. And of those 30, 29 of them substituted to the generic. And in every time of those 29, 100 percent of them paid less for the generic. In other words, we know when you shift from the brand to the generic, you definitely pay less. And that the vast majority, 98 percent of class members, buy the generic when it became available. So here below, the defendants really only raised two issues. They said, well, three brand companies only bought the brand and they never bought the generic. Well, we say, and the Magistrate Judge and Judge Miller said, but that's because these three brand companies were buying this drug at all by the time the generic became available. And we know from your own records that 98 percent of the class members will buy the generic if it's available. So that's not an average, and that's a logical inference that these jurists were entitled to make. And then for six other small amount of purchasers, the defendants argued, well, this group of folks, they didn't buy an awful lot of the generic when it became available, so we don't know about them. But again, it's not the amount that you buy, it's whether you would have had any amount of injury at all. And again, I think that these jurists were well within their discretion to make the findings they did in that regard. Really, this whole averages argument that the defendants have made was an afterthought. Their opening opposition brief spent one page of text on the issue of predominance and never used the word average. This only came up after the record was set up when the Lomyctl decision came down, and the defendants have been trying to jump on that as if it's a bandwagon, but the report recommendation and the decision here both explicitly took up whether Lomyctl applied, how it does not apply to these circumstances, because this is not an averages case. I'll also say the same thing then going back to the Modafinil case, and Judge Floyd asked my colleague whether or not that test should be employed here. What I'll also say about that case, Your Honor, is this. First, again, Judge Miller and Judge Smith, being careful as they are, explicitly take up Modafinil and follow its holdings to make sure that if this court were to follow everything religiously about what would happen in that case, whether or not this class would be sustained, and they rule that it does not overcome the issues. What I will say in particular about Modafinil is Modafinil said that there are two considerations that are primary on the numerosity problem. One is judicial economy, and then the second is whether or not the class members have the ability to come into the market. On judicial economy, Modafinil also said if you've got judicial economy and there's some inability of some of the class members not to be joined, why would you not certify the class? Of course he would certify the class. The other issue in Modafinil was then the ability of the class members to bring their own case. And really the defendant's argument boils down, as even their beginning introduction here, is that they find offensive in some way the fact that the class includes three national wholesalers. The real question should not be whether they're in there, but rather if you deny certification, who's going to be left out? And so let me just make sure that these three points are clear. First, in the United States, people when they go to their local pharmacy and they buy drugs, they're buying drugs that made their way to the pharmacy through the so-called retail channel distribution. That marketplace, that distribution has over the years become more and more consolidated. It does have three national wholesalers, but it also has three score or more smaller wholesalers scattered throughout the United States that also distribute the drugs. In the United States, also under federal law, when a brand company overcharges for the brand product by violating the antitrust laws, the parties that can recover are the direct purchasers. So in the United States, you're going to see this marketplace of these distributors coming to the fore to bring the cases. So it ought not be a surprise then that 21 district courts have certified this class with the same makeup and two circuit courts have affirmed these classes, all of those cited in our brief. So why do I not find offensive than having these three big wholesalers in the class? Well, first, it's not what is important to think about. The question really is we want to make sure that those of the smaller claims are in the class. And the other thing, too, by the way, is these big three wholesalers, they pay their fair share. They're not free riding. If there's a recovery, they have to pay their fair share of the expenses and the attorney's fees. If there's a defense verdict, they're out of luck. So they're paying their fair share. And finally, I'll just say that the Supreme Court in Amkin cited in our brief said that there's nothing in the rules that has for class certification that finds offensive having class members with large claims. And I think that that point, bottom line, is that the Supreme Court has already rejected the fundamental premise of the defendant's arguments in this case. There's no questions. I'm done. Thank you, Mr. Sobel. Mr. Butkus. Thank you. And so Mr. Sobel is pressing a position that's directly at odds with Modafinil. The facts were exactly the same. It was a reverse payment class action. The same situation, the three big companies had the major majority of the claims. The district courts made the exact errors. They misapplied. They made exactly the errors they considered would there be more individual suits. Modafinil said that's not proper. The question is practicability. With respect to discovery, will there be future discovery? That was exactly the issue. So they're pushing for a circuit split. If this court finds there is numerosity, then we have a circuit split. There's no reason to create that kind of split. Secondly, Judge Rushing was making the point that the burden under Dukes versus Walmart and other cases, plaintiffs have to prove that there is grounds for certification on each element, including numerosity, by preponderance of the evidence. They can't just speculate. They can't just speculate that people wouldn't join the case individually. They have to provide evidence. And as the district court and the magistrate judge found, they didn't provide evidence. They provided a declaration, I think, from Mr. Sobel that just assumed and speculated that all the plaintiffs would hire their own experts when we know that's not true. Mr. Sobel mentions the retailer class. The retailers have been joining with the direct purchasers and the end purchasers to hire the same experts to oppose summary judgment motions. So the facts here support our theory. Nobody's going to go have 150 lawyers doing the same things over and over. And the question here, they didn't put any evidence in on that, Your Honors, that they had a burden to prove that people wouldn't join if they were joined or as opposed to a class. And as the district court and magistrate judge found, they didn't put in any evidence. They claimed there might be retaliation. They didn't put in any evidence that anyone was concerned about retaliation. And in fact, here, there's no evidence in Modafinil. Mr. Sobel suggested it would be impossible to demonstrate these things. Now, parties put in declarations. They say, we couldn't do this. It wouldn't be practicable. So they're pushing for a position that would directly contradict the Third Circuit, that directly contradicts Dukes in terms of not putting on evidence. The district court was supposed to engage in rigorous analysis to see if they had demonstrated numerosity and these other factors, and they just simply put in no evidence. And the question isn't, would each of the parties, the class members here, join an individual action as joinder? The question is whether it would be impracticable. And there's no evidence that it would be impracticable. There's no evidence that it would be impracticable to hire the same expert. They hired one expert here. They already have the expert. Mr. Sobel assumed he knows better than this. Not every party is going to hire a different expert and pay them $3 million. That's absurd. And so the class actions are meant to foster efficiency and fairness at the same time. There's no reason to struggle to allow these sketchy named plaintiffs who each have major problems to represent everybody else when it would be perfectly practicable to have an individual action where parties could decide whether or not to join the class action. And Mr. Sobel suggests, well, one party, and there's no evidence, as the district court found, that any party would not join. It's very easy to join if Mr. Sobel continues to litigate for one of these plaintiffs. The others would file a joinder and make their choices. The district court did not find, Judge Neumeier, that the courtroom would be filled with lawyers and it would be hard to manage. And the district court did not find that it would be difficult for parties from different places around the country. And in fact, none of the named plaintiffs here are from Virginia. Everyone's doing things remotely. It's very efficient. Can I ask you about this question about who would join? The district court called it a high standard under A-1 and said that you have to show impracticality that all could be joined. And I've been trying to sort out what the court meant by that, what sort of interpretation was going on there. Obviously, the burden's not on you to show that everyone would join. But the court seemed to be emphasizing the all there and saying that that was important in the analysis. And I wondered what your thoughts were on that, if the parties had argued about that in the district court, or what was going on there. Your Honor, I think it is one of the core legal errors the district court committed. The analysis went something like this. Since Rule 23A says, is it impracticable for all to join, if there was some theory that maybe someone had a negative value claim, which was the plaintiff's argument, then that meant it was impracticable for all to join. That's an incorrect legal analysis, and there's no evidence. As the district court itself found, the plaintiffs offered little evidence that class members would not join the suit on their own if it was individually. And so think about that. I think they had four claimants who had claims under $300,000. It was a very small group. Their claim is that, well, if we just assume with no evidence that they wouldn't join individually and there's no evidence, then that's enough to certify a class. That has it completely backwards. And I think, Your Honor, that goes to the just core error of the case. And again, I'll just finish with this. I think Madaffinil has a straightforward framework. The district court and the magistrate judge made the exact errors that the district court in Madaffinil made. They would create a circuit split unnecessarily. And this case can, in a very practicable way, be litigated as a withjoinder as opposed to the class action, which is the exception, not the rule. And I thank you all for your time. All right. Thank you. I, as you know, the custom of the Fourth Circuit, and I think it's the only the Fourth Circuit, is to come off the bench and shake your hands and tell you how great your arguments were and appreciate them. And the best we can do is to say that now. And we do appreciate your arguments.
judges: Paul V. Niemeyer, Henry F. Floyd, Allison J. Rushing